IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NOVARTIS CORPORATION           :
                               :
                               :
   v.                          :    Civil No. CCB-11-3620
                               :
                               :
WEBVENTION HOLDINGS LLC &      :
WEBVENTION LLC                 :

## MEMORANDUM

Now pending is Novartis Corporation's ("Novartis") motion for attorney's fees under 35 U.S.C. § 285, and for an extension of thirty-five days to file its memorandum pursuant to Local Rules 109.1 and 109.2 regarding the amount of fees and costs.[1] Webvention Holdings LLC and Webvention LLC (collectively, "Webvention") have filed in response an opposition to the motion. No oral argument is necessary. *See* Local Rule 105.6. For the reasons that follow, Novartis's motion will be granted.

## BACKGROUND

In 2009, Webvention acquired U.S. Patent No. 5,251,294 ("'294 patent"). (Mot. Stay Ex. C, Mar. 30, 2012 Hearing Transcript ("Hearing Transcript") 4, ECF No. 48-5.) The patent dealt with a webpage functionality known as "mouse over" or "preview," which displays a short summary of the information to be found through an internet link when a computer user points the mouse or cursor at the link. (Hearing Transcript 12-14.) After acquiring the patent, Webvention began a broad enforcement campaign demanding a "five-figure license fee" from companies it said were using the patented technology. (Corrected Mem. Supp. Mot. Stay ("Corrected Mem.") 3, ECF No. 49-1.) Webvention sent Novartis a demand letter on August 4, 2010, offering

---

[1] Although not addressed here, Novartis has preserved its right to seek recovery from Webvention counsel under 27 U.S.C. § 1927 and Fed. R. Civ. P. 11. (*See* Reply Supp. Mot. Att'y Fees 7-8, 11, ECF No. 95.)

1

Novartis a license to use the patented technology if it paid Webvention $80,000 within forty-five days. (Mot. Decl. J. Ex. A, Demand Letter, ECF No. 71-1.) Webvention also brought four "waves" of litigation in the Eastern District of Texas against companies that refused to pay the licensing fee. (Hearing Transcript 5.) Webvention filed its first patent infringement case against nineteen defendants in July 2010. *See Webvention LLC v. Abercrombie & Fitch Co.*, No. 10-253 (E.D. Tex. filed July 20, 2010). A few months later, Webvention sued another twenty defendants. *See Webvention LLC v. Adidas America Inc.*, No. 10-410 (E.D. Tex. filed Oct. 5, 2010). In April 2011, Webvention sued yet another twenty defendants. *See Webvention LLC v. Allergan, Inc.*, No. 11-225 (E.D. Tex. filed Apr. 19, 2011). In the "fourth wave," Webvention brought a series of lawsuits against individual companies. (Hearing Transcript 5.) In most cases, those companies that were sued settled. (Hearing Transcript 5.) Separately, dozens of companies preempted infringement suits by bringing declaratory judgment actions against Webvention in the District of Delaware. (*Id.* at 5-6.) On September 17, 2010, Novartis filed a declaratory judgment action against Webvention asking the court to declare that Novartis did not infringe the '294 patent and that the patent was invalid in the first instance. (Compl. Decl. J., ECF No. 1.) The patent expired in October 2010. (Corrected Mem. 3.) On December 15, 2011, the United States Judicial Panel on Multidistrict Litigation granted a motion by defendants in two of the Eastern District of Texas infringement suits to consolidate both the infringement and declaratory judgment actions into a single multidistrict suit to be transferred to this court. (Transfer Order, ECF No. 23.)

In September and October 2010, anonymous third parties separately requested ex parte reexaminations of the '294 patent. (Corrected Mem. 5; Hearing Transcript 18.) The United States Patent and Trademark Office ("PTO") granted both requests and merged them into one

proceeding. (*See* Mot. Stay Exs. D & E, Reexamination Docket Sheets, ECF Nos. 48-6, 48-7.) On June 28, 2011, the PTO issued a Notice of Intent to Issue a Reexamination Certificate confirming the claims as patentable. (Mot. Stay Ex. J, Notice of Intent to Issue Reexamination Certificate, ECF No. 48-12.) In September 2011, Webvention filed an "Information Disclosure Statement" ("IDS") with the PTO. (Mot. Stay Ex. K, Information Disclosure Statement ("IDS"), ECF No. 48-13.) The IDS included prior art references that Webvention had not previously disclosed. (*Id.*) Webvention had been notified of these prior art references in a September 2010 letter from a company that received a license demand from Webvention, but did not disclose these references to the PTO until after the substantive portion of the reexamination had concluded. (Mot. Stay Ex. L, September 2010 Letter, ECF No. 48-14.) As a result of the late submission of the IDS, the references were not considered in the final reexamination certificate that issued on October 4, 2011. (Corrected Mem. 7; *see also* Mot. Stay Ex. N, 2011 Order Granting Reexamination 6-8, ECF No. 48-16.) On October 7, 2011, counsel for one of the original requesting parties submitted a new reexamination request. (Mot. Stay Ex. M, 2011 Req. for Ex Parte Reexamination, ECF No. 48-15.) The new request sought reexamination based on, *inter alia*, the references Webvention had disclosed in the IDS. (*Id.* at 8.) In April 2012, the PTO reexamined the '294 patent and rejected the patent claims asserted against Novartis. (Mot. Stay Ex. Q, 2012 Office Action in Ex Parte Reexamination, ECF No. 48-19.) That rejection became final on September 24, 2014. (Decls. Supp. Mot. Att'y Fees Ex. E, Reexamination Docket Sheet, ECF No. 89-5.)

In light of that development, Novartis moved, on February 6, 2015, for judgment on the pleadings and for a finding that this case is "exceptional" under 35 U.S.C. § 285. (ECF Nos. 69–72.) On February 20, 2015, before the court decided Novartis's motion, Webvention filed a

covenant not to sue Novartis for infringement of the '294 patent. (Statement of Non-Liability Regarding U.S. Patent No. 5,251,294 ("Covenant"), ECF No. 75.) That same day, Webvention moved to dismiss for lack of subject matter jurisdiction on the ground that its covenant mooted any actual controversy in the case and that, accordingly, the court no longer had jurisdiction. (Mot. Dismiss 3, ECF No. 76.) On June 22, 2015, this court dismissed with prejudice Webvention's infringement counterclaim under Fed. R. Civ. P. 41(a)(2), granted Webvention's motion to dismiss, and denied Novartis's motion for judgment on the pleadings as moot. (ECF Nos. 84, 85.) The court also found Novartis was the "prevailing party" within the meaning of 35 U.S.C. § 285 and, accordingly, held that it would continue to hear Novartis's request for attorney's fees. (*Id.*)

## ANALYSIS

### A. 35 U.S.C. § 285

The Patent Act's fee-shifting provision authorizes district courts to award reasonable attorney's fees to prevailing parties in "exceptional cases." 35 U.S.C. § 285. In 2014, the Supreme Court overturned "unduly rigid" Federal Circuit precedent and held that an "exceptional case" was "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755, 1756 (2014).[2] District courts "may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* at 1756. A case may be considered exceptional due to litigation-related misconduct, even if not independently sanctionable. *Id.* at 1756-57. If there is no misconduct, "a case presenting either subjective bad faith or exceptionally meritless claims

---

[2] *Octane Fitness* overturned *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005).

4

may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757. Looking to its case law under the Copyright Act for guidance, the Supreme Court said that district courts could consider a list of non-exclusive factors, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence" when determining whether to award fees. *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). A movant must establish an exceptional case by a preponderance of the evidence. *Id.* at 1758. In a decision issued the same day as *Octane Fitness*, the Supreme Court also held that an appellate court should review all aspects of a district court's section 285 determination for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747 (2014).

Viewing the evidence in light of the totality of the circumstances, Novartis has established that this is an "exceptional case," and it is entitled to attorney's fees. The combination of Webvention's practice of offering licensing fees that were far lower than the cost to defend a patent infringement lawsuit, thus inducing companies to settle rather than litigate, its late disclosure to the PTO of prior art in its possession, and its dealings with Novartis specifically create inferences of improper motivation, litigation misconduct, and a need for deterrence sufficient to justify awarding Novartis attorney's fees.

<u>Nuisance Settlements</u>

After Webvention acquired the '294 patent in 2009, it began a broad enforcement campaign demanding licensing fees from companies it said were infringing the '249 patent. (Corrected Mem. 3.) Webvention sent Novartis a demand letter on August 4, 2010, telling Novartis it could license the patented technology if it paid Webvention $80,000 within forty-five

days. (Demand Letter 1.) Webvention claimed to have licensed the technology to more than 350 companies. (Mot. Stay Ex. A, ECF No. 48-3.) In addition, Webvention brought four "waves" of litigation in the Eastern District of Texas against companies that refused to pay the licensing fee. (Hearing Transcript 5.) Before the second wave of lawsuits, which were brought in October 2010, a third party sent Webvention a letter informing it of prior art that called the validity of the '294 patent into question.[3] (September 2010 Letter.) In many cases, the parties settled before the lawsuits reached the discovery stage of litigation. (Hearing Transcript 5.)

As the Federal Circuit has pointed out, it is not improper for a patentee to vigorously enforce its patent rights or offer standard licensing terms. *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1328 (Fed. Cir. 2011). "But the appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith." *Id.*; *see also SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015) ("[A] pattern of litigation abuses characterized by the repeated filing of patent infringement actions for the sole purpose of forcing settlements, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285.").[4] Here, Webvention's sole purpose was to extract licensing fees from as many companies as possible. (Decls. Supp. Mot. Att'y Fees Ex. B, Webvention's Website, ECF No. 89-2 (describing itself as "an intellectual-property licensing company").) It sent demand letters to companies with licensing offers at a fraction of the price it would cost to fully litigate the

---

[3] Because Webvention does not assert that it did not receive the 2010 letter, it is reasonable to assume that Webvention received it soon after it was sent. (*See* Def.'s Mem. Law Opp'n Att'y Fees 12, ECF No. 93 ("Novartis, in its opening brief, suggests that Webvention should have initiated its own reexamination proceedings when presented with the prior art. . . . Webvention at no time (even today) believed the text at issue in any way constituted invalidating prior art.") (internal citation omitted).)

[4] Although the *SFA Systems* Court ultimately upheld the district court's denial of attorney's fees, the Federal Circuit emphasized that it "[did] not hold that the district court cannot consider a patentee's pattern of prior litigation in determining whether a case is exceptional," and instead held that "a district court *should* consider a patentee's pattern of litigation where adequate evidence of an abusive pattern is presented." 793 F.3d at 1352 (emphasis added).

dispute, thus inducing nuisance settlements. (*See, e.g.*, Demand Letter.) The fees demanded by Webvention apparently were not altered to reflect the extent to which a company allegedly was infringing, but were based on how quickly the company accepted the licensing offer and thus induced quick settlements. (Decls. Supp. Mot. Att'y Fees, Ryberg Decl. ¶ 10, ECF No. 89.) The fact that discovery costs can be quite high "increas[es] the nuisance value that an accused infringer would be willing to settle for in a patent infringement case," as many companies faced with a Webvention demand letter apparently recognized. *Eon-Net LP*, 653 F.3d at 1327.

If negotiations broke down, Webvention sued. (Hearing Transcript 5.) Indeed, it initiated twenty-one lawsuits against eighty-eight defendants. (Ryberg Decl. ¶ 11; *see also* Hearing Transcript 5.) As Novartis points out, Webvention did not sue any web developers who had a financial stake in the technology and would, therefore, have an economic incentive to litigate. (Mem. Law Supp. Mot. Att'y Fees 13, ECF No. 88.) In many cases, the parties settled before the lawsuits reached the expensive discovery stage of litigation. Specifically, as of March 2012, "[t]he first wave of litigation completely settled. The second wave ha[d] three or four defendants remaining. The third wave ha[d] . . . about eight defendants remaining." (Hearing Transcript 5.) Thus, if the demand letters did not induce settlement, the threat of expensive litigation did. Webvention itself risked little with these tactics: "As a non-practicing entity, [it] was generally immune to counterclaims for patent infringement, antitrust, or unfair competition because it did not engage in business activities that would potentially give rise to those claims." *Eon-Net LP*, 653 F.3d at 1327. And it did all this despite being in possession of a letter identifying prior art. The lack of a reasonable pre-suit investigation, and a party's continuing unreasonable behavior before and during trial, is relevant to the finding of an "exceptional" case. *See, e.g.*, *LendingTree, LLC v. Zillow, Inc.*, 54 F. Supp. 3d 444, 461 (finding that the plaintiff's "unreasonableness is not

7

limited to its pre-suit conduct, but extends to its behavior during pretrial and trial proceedings"); *Lumen View Tech., LLC v. Findthebest.com, Inc.*, 24 F. Supp. 3d 329, 336 (S.D.N.Y. 2014) (finding that a lawsuit is more likely to be "exceptional" under the *Octane Fitness* standard if "the most basic pre-suit investigation would have revealed" the non-infringement).

The fact that Webvention sent hundreds of demand letters to companies inducing them to quickly pay licensing fees, initiated scores of lawsuits over a short period of time, and appeared to have no other business purpose (and therefore little financial downside to its strategy) demonstrates that the company's sole purpose was to "exploit[] the high cost to defend complex litigation to extract a nuisance value settlement" from companies allegedly using the '249 patent. *Eon-Net LP*, 653 F.3d at 1327 (finding that "[e]ach complaint was followed by a 'demand for a quick settlement at a price far lower than the cost of litigation, a demand to which most defendants apparently have agreed'"). This combination, along with the fact that Webvention had received a letter notifying it of dispositive prior art before it initiated the second wave of lawsuits, is enough to question the motivation of Webvention. *See SFA Sys., LLC*, 793 F.3d at 1349 (finding that its case law "observ[ing] that a district court may declare a case exceptional based on unreasonable and vexatious litigation tactics, even where it finds the legal theories advanced not objectively baseless," including *Eon-Net LP*, survived the Supreme Court's opinion in *Octane Fitness*); *see also LendingTree, LLC*, 54 F. Supp. 3d at 460 (finding it notable in its decision not to award attorney's fees that the case was "readily distinguishable from those cases involving non-practicing entities whose sole business model is to acquire patents and litigate rights associated with the patents, usually in an attempt to obtain a settlement or license with the allegedly infringing company"). *Octane Fitness*'s "deterrence" consideration also counsels in favor of an "exceptional case" finding given "the absence of any reasonable pre-suit

investigation" and "the number of substantially similar lawsuits filed within a short time frame," both of which suggest that Webvention's actions were not isolated but "part of a predatory strategy . . . ." *Lumen View Tech., LLC*, 24 F. Supp. 3d at 336. But even if these factors, standing alone, did not warrant awarding Novartis its attorney's fees, Webvention's conduct before the PTO after receiving notice of prior art, and its interactions with Novartis specifically, support the court's finding that this is an exceptional case.

Webvention's Conduct Before the PTO[5]

In September 2010, counsel for a company that had received a demand letter from Webvention sent Webvention a letter notifying it of prior art. (September 2010 Letter.) The letter, *inter alia*, included a copy of portions of a 1988 textbook, *Hands-on Hypercard: Designing Your Own Applications* ("Hands-on Hypercard"), which included a tutorial showing users how to "mouse-over" a solar system diagram, whereby windows previewing information about the planets would appear.[6] (*Id.* at 318.) In September and October 2010, anonymous third parties requested ex parte reexaminations of the '294 patent, and, in February 2011, the PTO merged the proceedings into one. (Corrected Mem. 5; Hearing Transcript 18; Reexamination Docket Sheets.) Webvention argued that the technology described in the prior art submitted by the third parties, which did not include the relevant excerpt from the Hands-on Hypercard

---

[5] Post-*Octane Fitness*, courts have disagreed on the burden that applies to proving inequitable conduct before the PTO. *See Stretchline Intellectual Props. Ltd. v. H&M Hennes & Mauritz LP*, No. 2:10-cv-371, slip op. at 5 (E.D. Va. Sept. 3, 2015). Some courts have held that clear and convincing evidence is the standard during the liability phase, whereas a preponderance of the evidence standard applies when inequitable conduct is raised as the basis for a fee award under 35 U.S.C. § 285. *See id.* Regardless of whether Novartis could establish that Webvention engaged in inequitable conduct before the PTO, this court finds that Webvention's actions at least justify an inference of improper motivation or subjective bad faith, both of which can be included in a district court's totality of the circumstances inquiry upon a showing of a preponderance of the evidence. *Octane Fitness*, 134 S. Ct. at 1756 n.6, 1757. The Federal Circuit has said that an inference of bad faith can be drawn from circumstantial evidence, and that district courts can look to such factors as "the failure to conduct an adequate pre-suit investigation, vexatious or unduly burdensome litigation tactics, *misconduct in procuring the patent*, or an oppressive purpose . . . ." *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1311 (Fed. Cir. 2013) (emphasis added).

[6] It is possible that Webvention knew about the prior art before receiving the letter in 2010. The Hands-on Hypercard textbook was published in 1988. (September 2010 Letter.) The '294 patent was filed on February 7, 1990, and issued on October 5, 1993. (Demand Letter.)

textbook, was different than its patented technology, for which "[n]o user action, such as clicking, is required to initiate the display of the previewed information." (Mot. Stay Ex. I, Patent Owner's Statement of Interview 16, ECF No. 48-11; *see also* Mot. Stay Ex. H, Reexamination Interview Summ. 2, No. 48-10.) On June 28, 2011, the PTO confirmed the claims as patentable, stating that the "[t]he prior art of record . . . does not specifically disclose or fairly teach a method" described in the '294 patent, particularly that no user action beyond pointing or hovering is necessary to display the content. (Notice of Intent to Issue Reexamination Certificate 3). On September 6, 2011, Webvention filed an IDS with the PTO. (IDS.) The IDS included prior art references that Webvention had not previously disclosed, including the excerpts from the Hands-on Hypercard textbook that were attached to the September 2010 Letter.[7] (*Id.*) However, the merits phase of the ex parte reexaminations was closed with the PTO's June 28, 2011, decision confirming Webvention's technology as patentable, and was subject to reopening only at the initiative of the PTO or upon petition. (Notice of Intent to Issue Reexamination Certificate 1.) After the IDS, a third party requested a new reexamination based on the "no-button-press" feature described in the Hands-on Hypercard excerpts. (2011 Req. for Ex Parte Reexamination 7-8.) The PTO granted the reexamination, stating that "the features that predicated allowability during the prosecution history now appear to be disclosed in the newly cited prior art alone or in combination with each other." (2011 Order Granting Reexamination 7.) The PTO said that the Hands-on Hypercard textbook "was listed on an Information Disclosure Statement (IDS) filed after the mailing of the [Notice of Intent to Issue a Reexamination Certification] and was therefore not considered by the Examiner during the first reexamination proceedings." (*Id.* at 8.) The PTO reexamined the '294 patent and rejected the patent claims

---

[7] Portions of the Hands-on Hypercard textbook had been submitted by a third party in the first ex parte reexaminations, but did not include the excerpts that describe the "no-button-press" limitation that Webvention relied on to distinguish its patent from the submitted prior art. (2011 Req. for Ex Parte Reexamination 11-12.)

asserted against Novartis. (2012 Office Action in Ex Parte Reexamination.) That rejection became final on September 24, 2014. (Reexamination Docket Sheet.)

"Each individual associated with the patent owner in a reexamination proceeding has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability in a reexamination proceeding." 37 C.F.R. § 1.555(a). Any IDS "should be filed within two months of the date of the order for reexamination, or as soon thereafter as possible." *Id.* Here, it is reasonable to assume that Webvention received the letter from third party counsel regarding prior art shortly after it was sent in September 2010. Despite its receipt of this letter, despite the fact that the letter described the prior art as using the exact same technology that Webvention later would represent to the PTO differentiated its patent from the prior art (the no-click, mouse-over technology), and despite its duty to disclose all information material to patentability, Webvention did not inform the PTO of this information until the merits phase of the first reexaminations had concluded and more than two months—the proposed regulatory deadline for an IDS—from the date of the reexamination order. Webvention's actions before the PTO are enough to draw an inference of subjective bad faith. *See Kilopass Tech., Inc.*, 738 F.3d at 1311-12.[8]

Litigation Against Novartis

Novartis argues that Webvention has maintained its infringement claim unreasonably and multiplied the proceedings in this case unnecessarily. (Mem. Law Supp. Mot. Att'y Fees 14-15.)

---

[8] Webvention argues that Novartis should not be entitled to attorney's fees because third parties, and not Novartis, initiated and argued the ex parte reexaminations in front of the PTO. (*See* Def.'s Mem. Law Opp'n Att'y Fees 12-13.) This court disagrees. The reexaminations were relevant to this lawsuit, and Novartis was justified in relying on—and did rely when it asked this court to stay the proceedings during the reexaminations—the submissions to the PTO by other parties who Webvention similarly alleged were infringers of the '294 patent. Webvention's actions before the PTO are relevant to the *Octane Fitness* totality of the circumstances inquiry.

Webvention's conduct in relation to Novartis is yet another factor in the totality of the circumstances inquiry that supports the court's finding that this is an "exceptional case."

First, Webvention was uncommunicative and uncooperative even after the PTO found the '294 claims invalid. On November 11, 2014, approximately one month after the PTO's rejection of the '294 patent claims became final, Novartis emailed Webvention requesting its consent to a joint motion for entry of judgment that the '294 claims were invalid and that Novartis did not infringe any of those claims. (Mot. Decl. J. Ex. K, ECF No. 71-11.) Webvention's counsel refused. (*Id.*) Instead, on November 17, 2014, Webvention proposed filing a statement of non-liability regarding the '294 patent, which essentially served as a covenant not to sue. (*Id.*) Several days later, Novartis said it neither opposed nor supported the filing of the statement. (Mot. Decl. J. Ex. L, ECF No. 71-12.) Novartis followed up with Webvention on December 3 and December 22, 2014—without response—about the filing of the statement. (Mot. Decl. J. Exs. M & N, ECF Nos. 71-13, 71-14.) Webvention did not respond to any of Novartis's communications, even after this court requested a proposed briefing schedule regarding the matter of fees, (ECF No. 65), and even after Novartis submitted a proposed briefing schedule, (ECF No. 67). Not until February 20, 2015—when Webvention filed its response to the motions for judgment and attorney's fees, its statement of non-liability or covenant not to sue, and the motion to dismiss for lack of subject matter jurisdiction—did Webvention finally respond to any of Novartis's communications. (ECF Nos. 75-77.) Second, Webvention spuriously has tried to argue that its winding up relieves it of any responsibility to pay attorney's fees. As will be discussed below, this argument has no basis in Delaware or Texas law, and cannot be justified on public policy grounds. Finally, Webvention alleges that "Novartis picked this fight" when it filed a declaratory judgment action against Webvention in the District of Delaware, and this fact should be enough

to defeat Novartis's motion for attorney's fees. (Def.'s Mem. Law Opp'n Att'y Fees 4.) But Webvention conveniently fails to mention that its strategy explicitly included "initiat[ing] litigation" when licensing discussions broke down after Webvention sent its demand letters, (Hearing Transcript 5), which it had sent Novartis. And Webvention's demand letters included the name of the law firm it had retained to "assist the company in the licensing of the '294 patent," and noted Webvention was reserving all its rights including damages. (Demand Letter 2.) So although Novartis may have reached the courthouse first, it only preempted a lawsuit Webvention was almost certain to file if Novartis refused to pay a licensing fee. Webvention had every right to defend its patent before the PTO and in this court, and counsel has a duty to zealously represent its clients. But Webvention's uncooperativeness after the PTO's decision finding the '294 patent claims invalid, its unresponsiveness in the face of Novartis's reasonable attempts to conclude the dispute, and the spurious arguments it put forward to avoid paying costs or fees should—and will—be considered by this court in the totality of the circumstances analysis.

Overall, Webvention's conduct beginning when it first acquired the patent and began demanding licensing fees at a cost intended to induce settlements, to its withholding of information in front of the PTO, to its conduct in relation to Novartis justify an inference of improper motives, litigation misconduct, and subjective bad faith, and counsel in favor of awarding attorney's fees to deter this kind of litigation behavior.

**B. Local Rules 109.1 and 109.2**

Webvention also argues that, even if this is an "exceptional case" within the meaning of 35 U.S.C. § 285, Novartis is not entitled to attorney's fees because it failed to properly include a fees estimate. The Federal Rules of Civil Procedure require that a motion for attorney's fees be

filed no later than fourteen days after the entry of judgment, and state the amount sought or provide a fair estimate of it. Fed. R. Civ. P. 54(d)(2)(B). Local Rule 109.2 also states that any motion requesting an award of attorney's fees must be filed within fourteen days of the entry of judgment. Local Rule 109.2(a). A memorandum setting forth the nature of the case and detailing the fees calculation must be filed within thirty-five days from the date the motion is filed, unless "otherwise ordered by the Court." *Id.*; Local Rule 109.2(b). Non-compliance with these time limits is deemed a waiver of any claim for attorney's fees. Local Rule 109.2(a).

On June 22, 2015, this court issued its order and memorandum allowing Novartis to refile within fourteen days a motion for attorney's fees that complied with Fed. R. Civ. P. 54. (ECF Nos. 84, 85.) That decision, which also dismissed with prejudice Webvention's infringement counterclaim, was a final judgment. Novartis refiled its motion for attorney's fees on June 25, 2015, well within the fourteen-day limits of Fed. R. Civ. P. 54 and Local Rule 109.2. In that motion, it estimated its attorney's fees at approximately $100,000 and requested an extension to file its memorandum. This court finds that Novartis properly refiled its motion for attorney's fees, and will grant Novartis an extension of thirty-five days to file its memorandum.[9]

## C. Winding Up of Webvention

Webvention argues that, because it is no longer a legal entity, Novartis cannot recover fees from it (or Webvention counsel). This argument has no merit.

Webvention LLC, which dissolved on June 18, 2015, was a Texas limited liability company. (O'Kelly Aff. ¶ 13, ECF No. 94.) Texas law provides that "a domestic entity in the

---

[9] After a court finds a case to be exceptional and that attorney's fees are warranted, it then must determine the amount of the award. *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1326 (Fed. Cir. 2013) ("When assessing whether to award attorney fees under 35 U.S.C. § 285, a district court engages in a two-step inquiry. . . . If the court finds the case exceptional, it must determine whether an award of attorney fees is appropriate, and, if so, the amount of that award."). The court will wait for Novartis's memorandum before calculating the amount of the award.

14

process of winding up shall apply and distribute its property to discharge, or make adequate provision for the discharge of, all of the domestic entity's liabilities and obligations," Tex. Bus. Orgs. Code Ann. § 11.053(a) (West), and that, "[d]uring the winding up process, the domestic entity may prosecute or defend a civil, criminal, or administrative action," *Id.* § 11.052(b). Furthermore, a terminated entity continues for three years from termination for purposes of, *inter alia*, "prosecuting or defending in the terminated filing entity's name an action or proceeding brought by or against the terminated entity," "permitting the survival of an existing claim by or against the terminated filing entity," or "settling affairs not completed before termination." *Id.* § 11.356(a). If an action on an existing claim against a terminated filing entity has been brought before the expiration of the three-year period, the terminated filing entity continues to survive for purposes of the action "until all judgments, orders, and decrees have been fully executed . . . ." *Id.* § 11.356(c). Novartis's motion for attorney's fees is an action on an existing claim that was brought well within three years of Webvention LLC's dissolution. Therefore, Novartis can recover its attorney's fees from Webvention LLC.

Webvention Holdings LLC, the corporate parent of Webvention LLC, was a Delaware limited liability company that dissolved on July 6, 2015. (O'Kelly Aff. ¶ 13.) Delaware law provides that a limited liability company which has dissolved "[s]hall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the limited liability company which is the subject of a pending action, suit or proceeding to which the limited liability company is a party," and "[s]hall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within

10 years after the date of dissolution." Del. Code Ann. tit. 6, § 18-804(b) (West). If there are insufficient assets, such claims and obligations shall be paid or provided for to the extent of assets available. *Id.* Here, Novartis brought its motion for attorney's fees before Webvention Holdings LLC dissolved. Therefore, Webvention was obligated to "make such provision as will be reasonably likely to be sufficient to provide compensation" for the claims. *Id.*

Webvention cannot claim, therefore, under either Texas or Delaware law, that it is immune from its obligations solely because it wound up its businesses. Not only does this argument have no basis in law, but allowing entities to dissolve in order to avoid any contractual or other obligations would fly in the face of any rational public policy. To that end, this court will order Webvention counsel to identify all principals, including officers and agents, of Webvention LLC and Webvention Holdings LLC by name and their last known address within fourteen days in order to facilitate the award of attorney's fees.

## CONCLUSION

For the reasons stated above, this court finds that this is an "exceptional case" within the meaning of 35 U.S.C. § 285. Novartis's motion for attorney's fees, and for an extension of thirty-five days to file its memorandum regarding the amount of fees and costs pursuant to Local Rules 109.1 and 109.2, will be granted. Webvention counsel will be ordered to identify all principals, including officers and agents, of Webvention LLC and Webvention Holdings LLC by name and their last known address within fourteen days. A separate order follows.

| | |
|---|---|
| <u>October 28, 2015</u><br>Date | <u>       /s/       </u><br>Catherine C. Blake<br>United States District Judge |